## BALTIMORE & OHIO RAILROAD COMPANY *v.* UNITED STATES ET AL.

No. 404.   Argued April 11, 1928.—Decided May 21, 1928.

*Mr. Morison R. Waite,* with whom *Messrs. D. P. Connell, Homer T. Dick, W. A. Northcutt, Guernsey Orcutt, Charles J. Rixey, Louis H. Strasser, W. J. Stevenson, Elmer A. Smith* and *Frank H. Towner* were on the brief, for appellants.

*Mr. Blackburn Esterline,* Assistant to the Solicitor General, with whom *Solicitor General Mitchell* was on the brief, for the United States.

*Mr. J. Stanley Payne,* with whom *Mr. P. J. Farrell* was on the brief, for the Interstate Commerce Commission.

*Mr. M. G. Roberts,* with whom *Messrs. Joseph M. Bryson, W. F. Dickinson, Edward J. White, E. T. Miller, C. S. Burg, Wallace T. Hughes* and *H. H. Larimore* were on the brief, for the Western Carriers, Appellees.

MR. JUSTICE BUTLER delivered the opinion of the Court.

The appellants,[1] for convenience called the east side lines, brought this suit to set aside an order of the Interstate Commerce Commission in respect of charges for transporting certain westbound through traffic from the lines east of the Mississippi at East St. Louis to the lines

---

[1] Appellants are: The Baltimore & Ohio Railroad Company; William W. Wheelock and William G. Bierd, Receivers of the Chicago & Alton Railroad Company; Chicago & Eastern Illinois Railway Company; The Cleveland, Cincinnati, Chicago & St. Louis Railway Company; Illinois Traction, Inc.; Illinois Central Railroad Company; Litchfield & Madison Railway Company; Louisville & Nashville Railroad Company; Mobile & Ohio Railroad Company; The New York, Chicago & St. Louis Railroad Company; The Pennsylvania Railroad Company; Southern Railroad Company, and Wabash Railway Company.

Appellees are: The Chicago, Rock Island & Pacific Railway Company; Missouri-Kansas-Texas Railroad Company; Missouri Pacific Railroad Company, and St. Louis-San Francisco Railway Company.

west of the river at St. Louis. The Commission and the carriers on whose complaint the order was made inter-vened. The district court, consisting of three judges (U. S. C., Tit. 28, § 47) dismissed the case for want of equity.

The order was made by the Commission after hearing on the complaint of four west side lines. They alleged that the practice of the east side lines requiring them to bear the expenses of transporting westbound through traffic across the river is unjust, unreasonable and illegal. They made no complaint as to the eastbound traffic, but they sought to be relieved from such charges on all the westbound through business and prayed reparation on account of such costs borne in the two years preceding the complaint. The Commission filed a report which was made a part of the order. 113 I. C. C. 681. It held—its Chairman and two other members dissenting—that the matter in controversy is a "practice" within the meaning of the Act. It found "that for the future the prac-tice of the east side lines in requiring the west side lines to bear the transfer charges on westbound freight traffic moving through St. Louis and East St. Louis on combina-tion rates which are the same on St. Louis as on East St. Louis will be unjust and unreasonable, and that the just and reasonable practice with respect to such traffic will be for the east side lines to bear or absorb all such transfer charges." The Commission was not convinced that the acceptance by the west side lines of divisions of joint rates did not constitute an acquiescence, tantamount to an agreement on their part to pay a transfer charge on through traffic moved on such rates. But it commended to the carriers a careful study of the divisions of joint rates on westbound traffic with a view to readjustment if necessary to conform to the just and reasonable practice in respect of interchange approved by the report. Repa-ration was denied.

The order[2] requires no change of divisions of revenues derived from traffic moving on joint rates. It covers only such of the westbound traffic as moves on combination through rates. It shifts from the west side lines to the carriers east of the river the burden of transferring that freight from east to west across the river. No change is ordered in the method of handling the traffic. No lack of facilities for the through routes, § 1 (3) (4), or for making the transfers, § 3 (3) was shown or found.

The appellants contend that the controversy involved rates and divisions and not a " practice " within the meaning of the Act, and that the evidence before the Commission was not sufficient to support a finding that it is or will be unjust or unreasonable to require the west side lines to bear such transfer charges or to warrant the order.

---

[2] " It is ordered, That the above-named defendants, according as they participate in the transportation, be . . . required to cease and desist, on or before October 12, 1926, and thereafter to abstain from the practice of requiring the above-named complainants together with the Chicago, Burlington & Quincy Railroad Company and the Wabash Railway Company, to bear the charges for transfer services from East St. Louis, Ill., to St. Louis, Mo., on westbound freight traffic passing through both points on combination rates which are the same on St. Louis as on East St. Louis.

" It is further ordered, That said defendants, according as they participate in the transportation, be, . . . required to establish, on or before October 12, 1926, upon notice to this commission and to the general public by not less than 30 days' filing and posting in the manner prescribed in section 6 of the interstate commerce act, and thereafter to maintain and apply to the transportation of westbound freight traffic passing through both East St. Louis, Ill., and St. Louis, Mo., on combination rates which are the same on St. Louis as on East St. Louis, and delivered to complainants, or the Chicago, Burlington & Quincy Railroad Company or the Wabash Railway Company, the practice of bearing or absorbing on such traffic the charges for transfer services from defendants' lines in East St. Louis, Ill., to the lines of complainants, or of the Chicago, Burlington & Quincy Railroad Company or the Wabash Railway Company in St. Louis, Mo."

The traffic at this crossing is very large. The railroad lines of the east side carriers terminate on the east bank, those of the appellee carriers on the west bank, and some carriers have lines on both sides. All, or practically all, of the traffic is handled for interchange between lines east and lines west by the Terminal Railroad Association and its subsidiaries. They are jointly owned or controlled by appellant and appellee lines. The arrangements for their use contemplate equal treatment of all carriers served by them. The proprietary companies have trackage rights over the lines of the Association between St. Louis and East St. Louis, but ordinarily they do not use them. The average haul for transfer across the river is about ten miles. The cost is higher than that attending transportation for like distances under ordinary circumstances.

The transfer charges complained of were assumed by appellee lines in order to enable them to compete with other railroads west of the Mississippi River. At first there was a separate rate or charge for the haul across the river. But in 1877, the Chicago & Alton Railroad Company built a line from the west across the Mississippi at Louisiana, Missouri, to a junction with its north and south line east of the river. That extension enabled it to open a route from the west to East St. Louis and there interchange with the east side lines. This competition for the haul between East St. Louis and the territory west of St. Louis compelled the four appellee lines to bear the cost of transferring across the river all through traffic in both directions. The Commission's report shows that now five of the eight lines on the west side that serve St. Louis also reach East St. Louis, and that three of them handle freight traffic to points west of the river without taking it through St. Louis. This is competition that must be met—if they would participate in the business—by the west side lines that reach East St. Louis only by means

of the facilities and services of the Association and its subsidiaries. Since the Alton opened its route to the west, the appellee lines have maintained the same rates from and to East St. Louis as from and to St. Louis. And, about 1908, upon the insistence of the business interests of St. Louis, the lines east of the river published and have since maintained, with some exceptions that need not be specified, the same rates from and to St. Louis as from and to East St. Louis. This was done by reducing the rates to and from St. Louis and by advancing most of the rates to and from East St. Louis. The decrease in revenue resulting from the reductions was much greater than the increase arising from the advances.

In 1905 the United States brought suit against the Terminal Railroad Association, carriers involved in this controversy and others in the district court for the eastern district of Missouri to prevent violations of the Sherman Anti-trust Act. A final decree in favor of the United States was entered in 1917 in accordance with the directions of this Court. 224 U. S. 383, 236 U. S. 194. On petition filed in that case by the appellee lines some years after the final decree, the district court, February 8, 1923, adjudged that in contempt of its decree the Association, its subsidiaries and proprietary companies, had continuously compelled the appellee lines to pay transfer charges for interchange between them and the east side lines on through traffic in both directions. It directed the east side lines to cease such violations and to pay for the use of the west side lines the total amount of the charges paid by the latter for the transfer of westbound through freight from March 2, 1914, to the date of the order. The east side lines and other companies so adjudged in contempt appealed; and, on October 13, 1924, this Court held that the original decree did not regulate rates, prescribe divisions of joint rates or fix liability for the transfer charges; that contempt proceedings did not lie to de-

termine the controversy between the east side lines and the west side lines or to require the former to make the payments ordered. *Terminal Railroad Ass'n* v. *United States,* 266 U. S. 17, 29, *et seq.*

The Commission's report states that the question before it was " whether the east side lines or the west side lines should bear the expense incident to the transfer across the Mississippi River from East St. Louis, Ill., to St. Louis, Mo., of practically all carload and less-than-carload through freight originating east of the St. Louis-East St. Louis district and destined west thereof." And the thing ordered by the Commission is the absorption by the east side lines of the transfer charges on westbound through traffic. It directed them to do exactly what the district court required them to do except that the latter's decree related to the past and the order of the Commission relates to the future. The matters in controversy in both proceedings were purely financial. There was no question concerning furnishing of facilities or the handling of traffic.

The larger part of the through traffic interchanged through the East St. Louis-St. Louis gateway moves on joint rates; and, for the purpose of divisions among participating carriers, these rates are deemed to " break " at East St. Louis. Each is made up of an amount to cover the part of the haul east of East St. Louis and an amount to cover the movement between that place and points west of St. Louis. The first amount goes to the lines east and the other, less the transfer charge, goes to carriers west of the river. Through traffic not covered by joint rates moves on through rates made up of combinations of local rates or local and proportional rates to and from East St. Louis. Where the combination on St. Louis is the same as on East St. Louis, the lines east of the river, by appropriate tariff provisions, § 6 (1), make their St. Louis-East St. Louis rates apply only to and from

East St. Louis. There are some exceptions, but they need not be set forth here. So all the revenues yielded by such rates, without deduction on account of charges for transfer, are retained by the carriers in the territory east of the river. But the Commission's order requires the rates, so by tariff provisions limited to East St. Louis, to be extended to St. Louis. This operates to deduct the cost of transfer from their revenue. In effect it is to require the cancelation of such tariff provisions, and to authorize a corresponding change in the tariffs of the appellee lines. It results that the controversy before the Commission involved divisions or apportionments of revenues derived from through traffic.

In holding that the matter in controversy is a "practice" within the meaning of the Act, the Commission relied on § 1 (6) and (11) and § 15 (1). Paragraph (6) makes it the duty of carriers to establish just and reasonable regulations and practices affecting classifications, rates or tariffs. Paragraph (11) requires them to furnish an adequate car service and to establish just and reasonable rules, regulations and practices, and declares to be unlawful every unjust and unreasonable rule, regulation and practice in respect of car service. The phrase "car service" is defined by paragraph (10) to include the exchange, interchange and return of locomotives, cars and other vehicles and also the supply of trains used by any carrier. Paragraph (1) of § 15 provides that whenever the Commission shall be of opinion that any individual or joint rate or classification, regulation or practice is or will be unjust or unreasonable, the Commission may prescribe just and reasonable rates, classifications, regulations or practices.

The word "practice," considered generally and without regard to context, is not capable of useful construction. If broadly used, it would cover everything carriers are accustomed to do. Its meaning varies so widely and de-

pends so much upon the connection in which it is used that Congress will be deemed to have intended to confine its application to acts or things belonging to the same general class as those meant by the words associated with it. *United States* v. *Pennsylvania Railroad Co.*, 242 U. S. 208, 229. When regard is had to that rule and the restrictions required to give the word a reasonable construction, it seems quite clear that "practice" as used in the provisions relied on by the Commission, does not include or refer to the method or basis used by the connecting carriers for their divisions of rates or revenues. And this is so whether the revenues are derived from joint rates or from combination though rates.

But even if the matter in controversy were a "practice" within the meaning of the Act, the Commission would not be authorized to set it aside without evidence that it is unjust or unreasonable. Paragraph (6) of § 15 empowers the Commission to prescribe divisions of joint rates, but there must be evidence adequate to justify action. *Brimstone Railroad & Canal Co.*, v. *United States*, 276 U. S. 104. *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274. *New England Divisions Case*, 261 U. S. 184. That rule may not be avoided by a broad construction of the word "practice." The record here contains all the evidence that was submitted to the Commission. Its report shows that "the propriety of divisions was not the subject of inquiry and investigation." The appellee lines adopted the policy of absorbing the transfer charges in order to meet competition of the Alton and have since continued to divide joint rates and apply their St. Louis-East St. Louis rates in combination on that basis. There is a strong presumption that the general level of their rates has been adjusted to include reasonable compensation for the services covered by them. The Commission found that appellee lines have long acquiesced

in the division of revenue derived from traffic moving on joint rates. They have not, by tariff provisions or otherwise, attempted to limit to St. Louis their St. Louis-East St. Louis rates when used in combination to move through traffic. The Alton and other like competitors of appellee lines bear the cost of the transfer across the river. The order makes no change as to them. But it takes the corresponding costs off appellee lines and puts that burden on the east side lines. The latter are required to absorb the transfer cost only when the traffic moves over the appellee lines.

. The Commission appears to have relied on evidence tending to show that, usually, when interchange is effected by means of an intermediate carrier, the delivering carrier bears the cost of switching. But such a practice does not tend to prove that it is unjust or unreasonable for the appellee lines, in order to meet competition of other west side lines, to bear the cost of transfer in both directions, or that the east side lines may not justly and reasonably limit their rates to East St. Louis when used in combination on through traffic at that gateway and so put appellee lines on equal footing with their competitors. The same considerations apply in determining the reasonableness of the apportionment of revenues derived from combination rates as govern the divisions of joint rates. The merits of the changes made by the order cannot be determined without a consideration of facts substantially similar to those specified in paragraph (6) of § 15 relating to the division of joint rates. The case was not presented by complainants or considered by the Commission on that basis. There was no evidence to show the amount of revenue required to pay operating expenses, taxes and a fair return on the property of appellee lines or that their rates were not adjusted or were not sufficient to cover the transfer charges in question. There was nothing to sup-

port a finding that it is or will be unjust or unreasonable for the appellee lines to bear the cost of transfer of the westbound through traffic. The order cannot be sustained. *Florida East Coast Ry.* v. *United States,* 234 U. S. 167. *Louis. & Nash. R. R.* v. *United States,* 238 U. S. 1.

*Decree reversed.*