NORTHERN PAC. RY. CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Intervenors).

No. 538.

District Court, D. Minnesota, Fourth Division.

Oct. 31, 1941.

440

Conrad Olson, of St. Paul, Minn. (L. B. da Ponte and M. L. Countryman, Jr., both of St. Paul, Minn., on the brief), for Northern Pac. Ry. Co.

J. P. Plunkett, of St. Paul, Minn. (F. G. Dorety and R. J. Hagman, both of St. Paul, Minn., on the brief), for Great Northern Ry. Co.

S. R. Brittingham, Jr., Sp. Asst. to the Atty. Gen., and Kenneth L. Kimble, both of Washington, D. C., for the United States.

E. M. Reidy, Asst. Chief Counsel of Interstate Commerce Commission, and Allen Crenshaw, both of Washington, D. C., for Interstate Commerce Commission.

J. A. A. Burnquist, Atty. Gen. of Minnesota, and George T. Simpson, of St. Paul, Minn., for the State of Minnesota and another.

Neal E. Williams, Sp. Asst. Atty. Gen. of the State of North Dakota, for the

Public Service Commission of North Dakota and another.

Before GARDNER, Circuit Judge, and NORDBYE and BELL, District Judges.

NORDBYE, District Judge.

The plaintiffs bring this action against the United States under the provisions of 28 U.S.C.A. §§ 41 (28), 43–48, to set aside an order of the Interstate Commerce Commission. A three-judge court was duly convened. The Interstate Commerce Commission, the State of Minnesota, the Railroad and Warehouse Commission of the State of Minnesota, the Minneapolis Traffic Association, the Chamber of Commerce of Fargo, North Dakota, and the Public Service Commission of North Dakota intervened as party defendants.

Complaint was laid before the Interstate Commerce Commission by the Minneapolis Traffic Association in behalf of divers milling companies, elevator companies, and other interests engaged in buying, selling, receiving and shipping grain, grain products and seeds at Minneapolis, Minnesota, and other points in said State (sometimes referred to herein as the complaining markets), concerning practices of certain carriers with reference to the absorption of switching charges. It appears that the matter was first heard before Division 2 of the Commission, and an order was filed therein on the 30th day of July, 1940. Thereafter, an order was entered reopening the matter for reargument before the entire Commission, it being submitted on November 26, 1940, and an order was entered on March 31, 1941, the effective date thereof being extended to August 25, 1941. The order requires certain railways, including the petitioners, to desist from certain practices relative to charges for switching shipments of grain, grain products and seeds in carload lots at certain terminal markets. Only Finding No. 1 of the Commission's order is questioned herein. On stipulation of the parties, an interlocutory injunction was granted by this Court on July 21, 1941, on the filing of suitable bonds by the petitioners to refund the difference between the sum the shippers would be required to pay as and for switching charges from August 25, 1941, and that which they would have been required to pay if the injunction had not been issued. The matter is now before this Court on a final hearing.

The practices complained of, and which the Commission found to be unreasonable, refer to the rules promulgated by these plaintiffs and other carriers governing the absorption of connecting-line switching charges on grain, grain products and seeds when such products are shipped to the Minneapolis, St. Paul, Duluth and Superior markets. At these markets, the plaintiffs have absorbed connecting-line switching charges on competitive traffic, but not on non-competitive traffic or on traffic local to their respective lines. While definitions vary somewhat between carriers, "competitive traffic", generally speaking, is that traffic which, as to any one carrier, originates at a point served also by another carrier, which other carrier handles the traffic at equal line-haul rates from origin to destination, and either performs the switching service or absorbs the switching charges of the connecting switching line serving the industry at destination. "Non-competitive traffic" is that which originates at a point served by a single haul carrier, or which is consigned to an industry on a line whose switching charge is not absorbed by a competing line-haul carrier. Minneapolis, St. Paul, Duluth and Superior are rate-break markets with respect to almost all destinations. To a certain extent, Chicago, Peoria and St. Louis are rate-break markets as to eastern destinations. These cities are competitive markets in the movements of grain and grain products. Under the practice of the railroads serving the grain markets in the Middlewest, not all shippers or receivers of grain are compelled in all instances to pay the switching charges of connecting lines at terminal markets. For many years, all carriers serving Chicago, Milwaukee, Peoria and St. Louis (sometimes referred to as the preferred markets), have absorbed switching charges at those points on all carload traffic involving non-competitive as well as competitive shipments of grain, grain products and seeds. Consequently, it will be observed that the shipper who patronizes the preferred area is relieved from the payment of any switching charges, whether the haul is competitive or non-competitive. The shipper, however, who moves his grain to the Twin City area, if the point of origin is not competitive, must pay the switching charge. Many examples of such practices are found in

the report of the Commission. A few illustrative examples may be cited. If, for instance, a car of grain moved on the Great Northern Railway to an industry located in Minneapolis situated on the Minneapolis, St. Paul and Sault Ste. Marie Railway (Soo Line), the delivery would involve a switching movement from the Great Northern and Soo Line interchanging track to the industry. A switching operation of the Soo Line is necessarily involved. These switching charges in the Twin City area vary, but the average charge is about $1.98 per car. Under the practice of these plaintiffs, if the point of origin was served by both the Great Northern and the Soo Line, the Great Northern would absorb the switching charge, but if the industry was located on the line of a carrier which did not serve the point of origin, the shipper or receiver would be required to pay the switching charge in addition to the line haul. Appleton, Minnesota, 144 miles from Minneapolis, is served by the Great Northern and the Chicago, Milwaukee, St. Paul & Pacific (the Milwaukee) railroads. A neighboring town, Holloway, is 138 miles from Minneapolis and is only served by the Great Northern line. In hauling grain from Appleton to Minneapolis for delivery to an industry on the Milwaukee, the Great Northern absorbs the switching charge. If, however, the grain shipment originated at Holloway and is consigned to the same industry at Minneapolis, the Great Northern does not absorb the switching charge, but requires it to be collected from either the shipper or the receiver. This illustrates the discrimination as between shippers. From Lineville, Iowa, which is served only by the Rock Island Railroad, the distance to Minneapolis is 353 miles, and the rate on grain is 22 cents a 100 pounds. The Rock Island does not absorb connecting-line switching charges on traffic from Lineville to an industry off its tracks at Minneapolis. From Lineville to Chicago, the distance is 376 miles and the rate is 21 cents. When a shipment from Lineville to Chicago necessitates a switching charge, the Rock Island absorbs it. This is an example of the discrimination found to exist between localities. Many more might be cited.

The Commission, in finding a violation of Section 1 of the Interstate Commerce Act, 49 U.S.C.A. § 1, held that the imposition, both relatively and absolutely, of a higher aggregate charge for transportation of grain to Minneapolis and the other terminal markets in this area than to Chicago or otherwise was not supported by revenue considerations or by sound transportation factors, and that, as to traffic in points in Minnesota, Montana, Iowa, and North and South Dakota, the rules and practices of the carriers involved are and will be unjust and unreasonable to the extent that they fail to provide for the absorption of switching charges on interstate shipments of grain, grain products and seeds in carload lots at Minneapolis, St. Paul, Duluth and Superior to the same extent and under substantially the same conditions as those under which such charges are absorbed at Chicago, Milwaukee, Peoria and St. Louis under rules and practices in effect at those points which the Commission found to be just and reasonable. The Commission further found that the carriers' switching charges absorption practices referred to, defeat the purpose of the elaborate grain rate structure which had been prescribed, by upsetting the balance which the Commission had fixed on rates from all important producing areas to the western markets, and concluded its findings as to the issues under Section 1 of the Act by stating: "In our judgment, the existence of such widespread practice of absorption at important markets other than those here complaining, established and maintained by the voluntary act of the defendants, is strong evidence as to the reasonableness of the practice, and of the unreasonableness of their non-absorption practices at the complaining markets." Report of Commission, Exhibit D, attached to the petition herein, p. 57.

The petitioners attack the order of the Commission on the following grounds: (1) That the order was beyond the statutory powers of the Commission as to petitioners' non-competitive traffic; (2) that the order violates the constitutional prohibition against taking property without just compensation and without due process of law; (3) that it is arbitrary; and (4) that it is not supported by the findings.

Section 1 (6) of the Interstate Commerce act, 49 U.S.C.A. § 1, prescribes a standard for carriers as to rules and practices. It provides: "It is hereby made the duty of all common carriers subject to the provisions of this part [chapter] to estab-

lish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, * * * and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this part [chapter] which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this part [chapter] upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful."

Section 15 (1) of the Act prescribes the power of the Commission to establish the rules and practices of carriers. The pertinent portion thereof reads: "That whenever, after full hearing, upon a complaint made as provided in section 13 * * * the commission shall be of opinion that any * * * regulation, or practice whatsoever of such carrier or carriers * * * is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this part [chapter], the commission is hereby authorized and empowered to determine and prescribe what * * * regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the commission finds that the same does or will exist * * * and shall conform to and observe the regulation or practice so prescribed."

That the rules and regulations promulgated by the carriers regarding the absorption of switching charges is a "practice" as that term is used in the statute seems reasonably free from doubt. It is true that "practice" as employed in the statute cannot have a meaning co-extensive with any exigency deemed to exist, or elastic enough to embrace everything a carrier may do. Baltimore & Ohio R.

Co. v. United States et al., 277 U.S. 291, 48 S.Ct. 520, 72 L.Ed. 885. But it does embrace those things that affect arbitrarily and unreasonably the purse of the shipper. As was said in United States v. Pennsylvania R. R. Co., 242 U.S. 208, 229, 37 S.Ct. 95, 101, 61 L.Ed. 251, when the court discussed the scope to be given to this term, "And there were many such acts for which the word could provide,—practices which confused the relation of shippers and carriers, burdened transportation, favored the large shipper, and oppressed the small one." The prime solicitude of the Interstate Commerce Act is the protection of passengers, shippers and consignees. Central R. Co. of New Jersey v. Anchor Line, 2 Cir., 219 F. 716. A regularly pursued course of arbitrary charges levied upon the public or a part thereof is a practice which, under the Act, the Commission is empowered to investigate and pass judgment upon.

The rules of conduct of the carriers are found in Section 1 (6). Petitioners contend that all the rules and practices embraced therein primarily relate to matters pertinent to the transportation of property by the carrier; that the order in question does not relate to the transportation of property by the petitioners, but is entirely a question as to whom shall bear the cost of transportation performed by some other carrier. They rely on Baltimore & Ohio R. Co. v. United States, supra, wherein the Supreme Court considered an order of the Commission which found the practice of certain eastern carriers in requiring the western carriers to bear the transfer charges on westbound freight traffic moving across the Mississippi River through East St. Louis and St. Louis, to be unjust and unreasonable. The court held that the Commission was without jurisdiction; that " 'practice' as used in the provisions relied on by the Commission, does not include or refer to the method or basis used by connecting carriers for their divisions of rates or revenues." Page 300 of 277 U.S., page 522 of 48 S.Ct., 72 L.Ed. 885. But there is this marked distinction between the two situations. The present matter does not involve a dispute between two carriers, but concerns the reasonableness of the practice of saddling certain charges on the shipper when such charges are not sustained by revenue considerations or sound transportation factors. The prob-

lem in the present proceeding is not comparable to an isolated situation affecting financially certain carriers, but is concerned with a practice which not only gives rise to discriminatory practices as between shippers and localities, but tends to affect adversely a definite transportation problem recognized in the Grain and Grain Products cases and companion matters hereinafter referred to.

We are referred to Interstate Commerce Commission v. Stickney, 215 U.S. 98, 30 S.Ct. 66, 54 L.Ed. 112, wherein the Supreme Court sustained an order restraining the enforcement of an order of the Commission requiring certain railroads running into Chicago to cease and desist from making a terminal charge of $2 per car for the transportation of livestock beyond the tracks of said railroads in Chicago, and for delivery thereof at the Union Stock Yards, and requiring them to establish and put into force for such services a charge of $1 per car. The distinction, however, between that situation and the present is evident. Here, the practice was found not to be supported by revenue considerations. In the Stickney case, not only was the $2 charge reasonable, but any wrongs of the shipper arose by reason of prior charges for transportation, and, as stated by the court, "If this charge, reasonable in itself, be reduced, the Union Stock Yards Company will suffer loss while the real wrongdoers will escape." Page 109 of 215 U.S., page 69 of 30 S.Ct.

In the proceeding known as Docket 17,-000, Part 7, Grain and Grain Products, the Commission prescribed rates on grain, grain products and seeds from points in Minnesota, Montana, Iowa, North and South Dakota, in which states the petitioners and other carriers involved operate, to Minneapolis, Duluth and other grain markets. That proceeding embraced the grain rate structure for the entire western area. 205 I.C.C. 301; 215 I.C.C. 83. Grain Case Modifications, 223 I.C.C. 235; 229 I.C.C. 9. In the proceeding known as Ex Parte 123, Fifteen Percent Case, 1937–1938, the Commission authorized an increase in such rates of 5%; 226 I.C.C. 41. Thereafter, such increases were made. The grain rates published by these petitioners and other carriers were for the most part single line rates; that is, they did not involve transportation over more than one line of railroad and were for transportation on a particular line to markets on the same line. Nevertheless, the line-haul rates from certain producing areas to the Minneapolis, St. Paul, Duluth and Superior markets were increased "for the purpose of bringing about an adjustment under which the rates to and from all western markets would be on relatively the same level, or an adjustment under which the rates to and from the markets would approximate a mileage parity." Order of the Commission, Exhibit D, attached to the petition herein, p. 53. The Commission further found in the proceeding in which the order complained of herein was entered that the switching absorption practices of these plaintiffs and the other carriers involved, defeat "this purpose in instances where they result in total charges to and from the complaining markets relatively higher than those to and from all other markets in midwestern territory." Order of the Commission, Exhibit D, attached to the petition herein, p. 53. In the Commission's first report in the Grain Rate Case, 164 I.C.C. 619, 697, will be found the following pertinent observation:

"In some respects, in a traffic sense, wheat is the most liquid commodity known in transportation. The classes or grades of wheat have long been standardized and, commercially, wheat approximates currency. The rate structure should permit it to move freely in all directions. Rates on wheat are closely related to one another, and even a slight change in one will ordinarily affect the movement governed by the others. In fact, generally speaking, all the rates on wheat may be likened to a huge blanket covering the entire country, and a pull on any part of this blanket to the extent of 1 or 2 cents, sometimes even a fraction of a cent, will be felt in every other part."

It seems clear, therefore, that the present problem before the Commission, in light of this factual background, must be viewed in a broad aspect. The Commission determined that the practices found to be unreasonable defeat the purpose of the grain rate structure where they produce, as plaintiffs' practices do, total charges for transportation to and from the complaining markets relatively higher than those to and from all other markets in the midwestern territory, and upset the delicate balance which the Commission endeavored to establish by its action in the grain rate cases. If it is assumed that

the average carload of wheat weighs 87,-000 pounds, and the average switching charge of $1.96 prevails, an amount of about $\frac{1}{8}$ cent per bushel would be involved. While this amount seems so small that it would not have a substantial effect on the movement of traffic, regardless of whether the charge is absorbed by the shipper or by the carrier, there was evidence before the Commission that, to attract grain, the price offered at Minneapolis must exceed the Chicago market, Milwaukee, Davenport and Cedar Rapids markets, by amounts varying from $\frac{1}{4}$ to $\frac{1}{2}$ cents per bushel. In meeting the problem of lack of uniformity in absorption of switching charges as between the complaining markets on one hand and the preferred markets on the other, the Commission considered the result on the movement of grain if the carriers voluntarily or by compulsion absorbed switching charges at the preferred points only to the extent that such charges were absorbed in the Twin City and Duluth areas, but concluded that: "Increases in transportation charges on grain to and from the alleged preferred points might be more detrimental to the producers than beneficial to the complaining markets; reductions, the evidence suggests, would benefit both producers and the complaining markets." Report of Division 2, Exhibit A, p. 41. If it be remembered that, in the opinion of the Commission on the showing before it, public interest requires that the grain rate structure be free from practices which disturb its balance and which may render chaotic that which must be kept as far as possible equalized, the purpose of the Commission in promulgating its order seems reasonably clear. The very fact that different practices are followed in regard to the absorption of switching charges in competitive markets fairly contiguous to one another, may produce a harmful result to the parity which the Commission is seeking to preserve. It must necessarily follow that the procedure of adjusting the rates and practices which affect the delicate balance of the grain rate structure is a matter peculiarly within the jurisdiction of the Commission. The lack of uniformity or any sound rules governing the carriers in the absorption of switching charges is fairly evident from the recitals in the Commission's findings. The carriers themselves have apparently caused the confusion and lack of any sound principle to guide, or uniformity to govern, their practice in this regard. In view of the problem before the Commission, it seems manifest that the practice should be corrected. The Commission has determined that the reduction in the charge to the shipper in both the preferred and complaining market areas will cause less disruption in the grain rate structure and less detriment to the grain markets than the continuance of the many various plans which the carriers themselves have instituted in this regard. But, in any event, it seems clear that the various factors referred to and which in the opinion of the Commission adversely affected the grain rate structure, are matters which the Commission had a right to take into consideration in so far as they may influence a decision of unreasonableness. Furthermore, the Commission was entitled to give probative value to the practices prevailing at Chicago, Milwaukee and other markets under substantially similar conditions. Western Chemical Co. v. United States, 271 U.S. 268, 46 S.Ct. 500, 70 L.Ed. 941; Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184; Youngstown Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L. Ed. 1553. In Adams v. Mills, supra, page 409 of 286 U.S., page 592 of 52 S.Ct., 76 L.Ed. 1184, the court stated:

"The defendants challenge the Commission's holding that the extra charge of 25 cents made to the shippers was an unlawful practice. * * * The decision of the question was dependent upon the determination of certain facts, including the history of the stock yards and their relation to the line-haul carriers; the history of the unloading charge at these yards; and the action of the parties in relation thereto. If there was evidence to sustain the Commission's findings on these matters, its conclusion that the collection of the extra charge from the shippers was an unreasonable and unlawful practice must be sustained."

Nor can these plaintiffs be sustained in their contention that, because they do not serve the so-called preferred area, as to them the practices of other carriers at those points cannot be held reasonable and the practices employed by them in this area unreasonable. The reasonableness of rates and practices may largely be determined by their relation to other rates and practices. The Commission has considered the effect of a uniform adoption

of the plaintiffs' practices as to the absorption of switching charges. It has found that such plan would not be fair and reasonable and that it would not produce the desired results in its problem in maintaining the balance in the grain rate structure. It found that: "No transportation or competitive factor justifies absorption practices at the complaining markets different from those prevailing at other markets in midwestern territory." Report of Commission, Exhibit D, attached to the petition herein, p. 63. It may be pointed out that the other carriers involved in this proceeding before the Commission have acquiesced in the Commission's order. As the situation now exists, the shippers on all other lines in the territory referred to will receive the advantages which the Commission deems necessary for all shippers and which will tend to stabilize the grain rate structure within such area. While plaintiffs' rights cannot be prejudiced because they alone resist the order, one cannot escape the conclusion that, in view of the circumstances, the granting of the injunction herein would, in effect, serve to create discrimination and maintain an undesirable practice which cannot be sustained by financial considerations or any impelling transportation factors.

The wisdom or expediency of the Commission's order is not for us to pass upon. An appraisal of the many and technical factors involved requires the judgment of an expert in this particular field. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260. It may be noted that this Court cannot, and is not asked in this particular proceeding to weigh the evidence introduced before the Commission. Our function is ended when we find a rational basis for the conclusions of the Commission. Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.

The petitioners contend that in many cases the Commission has held that, in absence of a finding of discrimination under Sections 2 and 3 of the Act, a practice will not be held unjust or unreasonable. Manufacturers Railway Co. v. St. Louis, I. M. & S. Ry., 28 I.C.C. 93, 103; Standard Packing Co. v. South Omaha Terminal Railway, 229 I.C.C. 479. It is not necessary to discuss the departure, if any, between the present order and the prior views of the Commission. Suffice it to say that the decisions are not stare decisis. An administrative agency may change its position. Virginian Ry. Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463. From a reading of the Act, it would appear that whether a practice is unreasonable does not necessarily depend on whether it is also discriminatory. Section 15 (1) uses the disjunctive in reciting the conditions under which a practice may be changed by the Commission. In other words, if a practice is unreasonable, or if it is discriminatory, or if it is preferential, the Commission is empowered to act.

The contention that the order of the Commission violates the Fifth Amendment, in that property is taken without due process of law and without just compensation, is based on the suggestion that the absorption of all such switching charges by the carrier amounts to confiscation or an unreasonable return. But the finding of the Commission that the absorption practices "are not supported by revenue considerations or sound transportation factors" eliminates that issue. Moreover, the contention is deprived of force when it is considered that such charges are absorbed by the carriers in most instances. Fear is expressed that the switching charges might become unreasonable and under the order herein an undue burden would be imposed upon the carriers, but if that situation arises, no doubt a proper remedy would be available to the petitioners. Section 13, Interstate Commerce Act. The views hereinbefore expressed dispose of the other points urged by the petitioners.

It follows, therefore, that the petition should be dismissed. Findings of fact and conclusions of law in harmony herewith may be presented upon five days' notice.