HOUSTON BELT & TERMINAL RAIL-
WAY COMPANY; Missouri Pacific
Railroad Company; Chicago, Rock Is-
land & Pacific Railroad Company; Fort
Worth & Denver Railway Company;
and Gulf, Colorado & Santa Fe Rail-
way Company, Plaintiffs,

v.

UNITED STATES of America and Inter-
state Commerce Commission,
Defendants,

Texas & New Orleans Railroad Company,
Intervenor.

Civ. A. No. 10434.

United States District Court
S. D. Texas,
Houston Division.

July 29, 1957.

R. S. Outlaw, L. W. Butterfield, Bruce
Dwinell, John Guandolo, R. T. Cubbage,
Chicago, Ill., T. R. Ware, G. W. Holmes,
St. Louis, Mo., M. S. McCorquodate,
Fulbright, Crooker, Freeman, Bates &
Jaworski, Houston, Tex., C. M. Spence,
Thompson, Mitchell, Thompson & Doug-
las, St. Louis, Mo., for plaintiffs.

Victor R. Hansen, Asst. Atty. Gen.,
Malcolm R. Wilkey, U. S. Atty., Houston,
Tex., James E. Kilday, James H. Durkin,
Attys., Dept. of Justice, Washington, D.
C., for defendant, United States.

Robert W. Ginnane, Gen. Counsel,
Samuel R. Howell, Associate Gen. Coun-
sel, Interstate Commerce Commission,
Washington, D. C., for defendant, Inter-
state Commerce Commission.

Tom M. Davis, John F. Heard, Finis
E. Cowan, Baker, Botts, Andrews &
Shepherd, Houston, Tex., for intervenor
Texas and N. O. R. Co.

Before BROWN, Circuit Judge, and
CONNALLY and INGRAHAM, District
Judges.

JOHN R. BROWN, Circuit Judge.

Brought under 28 U.S.C.A. § 1336 and
28 U.S.C.A. §§ 2321–2325, this action
seeks to set aside an order of the Inter-

state Commerce Commission dismissing a complaint by the plaintiffs here against Texas & New Orleans Railroad Company (intervenors here). The complaint before the Commission was directed to the manner of effecting the interchange of railroad freight cars in Houston, Texas, between the plaintiff lines owning Houston Belt & Terminal Railway Company (Belt) and T&NO. The arrangement under attack was established by contract and provided for interchange of cars at Englewood Yard in the immediate vicinity of a principal intersection of the lines involved.

The sole question presented is whether the Commission's order of dismissal, Houston Belt & Terminal Ry. Co. et al. v. Texas & New Orleans R. Co., 298 I.C.C. 221, was proper.

The following very briefly summarizes such facts as are necessary for the disposition we deem proper to the case. Belt is a common carrier by railroad subject to the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. Organized in 1907 as a joint venture of the other plaintiffs,[1] Belt was to and does perform the terminal services of its owning lines at Houston, Texas. Intervenor T&NO since 1934 has owned and operated all the railroad properties previously comprising the Southern Pacific lines[2] serving Houston.

Until 1912, with minor variations, interchange of cars between Belt's lines and T&NO lines was made to and from their respective yards. These yards were located at various points in and around the City of Houston. On May 12, 1912, largely at Belt's suggestion and apparently because of the increasing growth and resulting traffic congestion within the center of Houston, Belt entered into a contract with T&NO establishing as a transfer or interchange point Englewood Yard, owned by T&NO, and prior to this time used for the storage of obsolete and abandoned equipment. The contract, expressly stating that the parties desired to construct an interchange or transfer track at Englewood immediately adjacent to the intersection of the "respective main tracks of the parties" provided that each party would provide right of way and construct specified portions of the interchange and connecting track,[3] and each would be responsible for the movement of cars destined for the other lines from their respective trainyards to the Englewood interchange.[4] The track was constructed and cars were thereafter exchanged at Englewood.

About this time T&NO, in accordance with its plan, undertook to develop Englewood into its primary trainyard. This work began in 1913 and was completed at a cost of $600,000 in time for the move to be effected late in 1914 and early 1915. And here we arrive at the rub of the case. For now, instead of T&NO hav-

1. With various changes since 1907, these now are: Missouri Pacific Railroad Company; Chicago, Rock Island & Pacific Railroad Company; Fort Worth and Denver Railway Company; Gulf, Colorado & Santa Fe Railway Company. Missouri Pacific is present successor in title of four other lines. Belt's services are not rendered on the basis of published tariff rates, but by the payment of the using lines on a user basis, of the actual cost of the service rendered for each of them.

2. These were, in addition to T&NO: Houston and Texas Central Railway Company; Houston East & West Texas Railway Company; Galveston, Harrisburg & San Antonio Railway Company; The San Antonio and Aransas Pass Railway Company.

3. In practice, the actual interchange was always effected in the Englewood Yard since the track constructed under the contract, although used by Belt as a running track in going to and from Englewood Yard, was not of sufficient length or capacity to permit actual interchange.

4. For example: T&NO had to move all Belt destined cars from T&NO's Hardy St. Yard to Englewood interchange; conversely, it was up to T&NO to pick up at Englewood interchange and move to its Hardy St. Yard all cars destined for T&NO which Belt had delivered from its yards to Englewood interchange. The reverse was true for Belt to and from its South Yard and Englewood interchange.

ing to move, see note 4, supra, its cars several miles to and from Englewood interchange and its various yards, it had to make no movement for its trainyard and the interchange were right together. Of course Belt still had the movement to and from Englewood interchange and Belt's yards. While this left Belt just exactly as it was before and imposed no new burdens on it, Belt, with a sort of reverse of sauce for goose and gander, now began to feel, if not sound, its quarter century lament that if Belt had to move cars five miles, so should T&NO.

In 1929, this smouldering feeling of unfairness broke out and Belt filed a formal complaint with the Commission attacking the legality of the arrangement. This complaint, after hearing, was dismissed, Houston Belt & Terminal Ry. Co. v. Texas & New Orleans Railroad Co., 1930, 168 I.C.C. 260, on the authority of Baltimore & Ohio Railroad Co. v. United States, 277 U.S. 291, 48 S.Ct. 520, 72 L.Ed. 885.

In 1950 various adjustments occasioned by the placing into operation of the new Missouri Pacific Settegast Yard were made in the interchange arrangement, but retained was the 1912 contract with its basic principle of physical exchange at Englewood.[5] To the obvious query why Belt would so long (1922 to 1950) submit to, and indeed renew

(1950) an arrangement it thought so wrong, it suggested on argument that it felt obliged to wait until there was a substantial change in circumstances before again resorting to the Commission for relief. It found this, apparently, in 1953. In 1953 T&NO requested approval of a physical rearrangement of the connecting track at Englewood to enable it to carry out its comprehensive plans to convert the yard into a modern gravity type yard at a cost of approximately $6,000,-000. Belt, apparently sensing the possibility that this furnished a justification for repudiating the established arrangement, delivered an ultimatum that unless T&NO moved (or paid Belt to do so) the cars from Englewood to Belt's yards (Settegast or South), the existing arrangement would be terminated at a specified date, and the complaint proceeding would be instituted before the Commission. Following T&NO's refusal to agree to the proposed arrangement, Belt filed this complaint February 8, 1954. Subsequently, the parties agreed to shifting the track as requested by T&NO, but with the specific reservation that the agreement would in no way prejudice Belt's claim that the entire existing arrangement was unlawful.

Belt's attack is based principally upon Section 1(10), (11), and (14)(a) of the Interstate Commerce Act[6] as

---

5. The following exchange of memoranda is significant: On April 17, 1950 T&NO's Executive Vice President wrote the President of Belt: "6. Except as modified by this proposal, the existing interchange agreement between T&NO and HB&T, dated the 20th day of May, 1912, shall remain in full force and effect." The President of Belt, on May 26, 1950, wrote: "It has been concluded that the plan as outlined by you is satisfactory to the Houston Belt & Terminal Railway Company and its using lines * * * [T]he method of handling interchanges, as outlined in your memorandum should be made effective as of * * * [June 1, 1950]."

The proposals and counter proposals related primarily to certain operational matters of segregating and spotting cars into blocks. The acceptance above likewise spelled out that Belt agreed to do

the very thing which, four years later, Belt said was a violation of the Transportation Act:

"1. All cars interchanged between the T&NO on the one hand and the * * * [Belt] and its using lines on the other hand be physically interchanged at the T&NO Englewood yard.

"2. The * * * [Belt] will deliver and receive all such cars in that yard."

6. 49 U.S.C.A. § 1(10): "(10) 'Car Service' defined. The term 'car service' * * * shall include the use, control, supply, movement, distribution, exchange, interchange, and return of * * * cars * * * used in the transportation of property * * * and the supply of trains, by any carrier * * *."

49 U.S.C.A. § 1(11): "(11) Duty to furnish car service; rules and regulations. It shall be the duty of every carrier by railroad subject to this chapter

amended. Belt insists that in reading these sections together the result is inescapable that " * * * every unjust and unreasonable rule, regulation and practice * * * " with respect to the interchange of cars is unlawful and consequently the Commission has both the power and the duty to declare the arrangement between Belt and T&NO illegal and order what Belt considers a more equitable arrangement. Belt also relies on Section 3(1) and (4) of the Act [7] to further illustrate the duty of carriers to establish "reasonable" and "proper" interchange facilities. From this broad basis Belt moves to its second contention that the usual practice in the industry is for the delivering railroad to make delivery of interchange traffic to the rails of their connections. This (according to the Complaint in this Court action) "generally recognized obligation" has received specific Commission recognition [8] and is usually accomplished in one of two ways. The first is termed an "intermediate" interchange under which each carrier delivers and picks up cars at an intermediate point between the two trainyards. The second type of arrangement is called a yard-to-yard interchange under which each carrier delivers cars destined to the other into the trainyard of the other. Under either of these systems (or any one of innumerable variations of each) the expense of interchange is shared by the carriers concerned. Belt insists, however, that in the operation under attack the move by T&NO to Engelwood changed the system from intermediate to yard-to-yard, but with the important divergence from the usual yard-to-yard arrangement that Belt was required to perform all of the interchange work. Belt's contention now is that the burden of picking up cars destined for Belt's lines at the

to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation and practice with respect to car service is prohibited and declared to be unlawful."

49 U.S.C.A. § 1(14) (a): "(14) (a) The Commission may * * * establish reasonable rules, regulations, and practices with respect to car service by * * * carriers * * * and the penalties or other sanctions for nonobservance of such rules, regulations, or practices."

7. 49 U.S.C.A. § 3(1): "(1) It shall be unlawful for any common carrier * * * to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company * * * or to subject any particular person, company * * * to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

49 U.S.C.A. § 3(4): "(4) All carriers * * * shall * * * afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines * * *."

8. Kansas City Southern Ry. Co. v. Louisiana & A. Ry. Co., 213 I.C.C. 351, 359, "There is a generally recognized obligation on the part of all carriers on through traffic to make delivery on the rails of their connections, either direct or by bearing the charges of the intermediate switching line, and this is the general practice of railroads throughout the country. We believe this to be a just, fair and reasonable practice for general application."

But the Commission apparently recognizes as well that interchange arrangements are usually governed by agreement between the delivering and receiving lines and the interchange point should normally be as near as practicable to an intersection of the two lines. In Kansas City Southern Ry. Co. v. Louisiana & A. Ry. Co., supra, (relied on by Belt) 213 I.C.C. at page 355: "The general practice among railroads is to interchange carload traffic in accordance with agreement between the delivering and receiving lines." And in Peoria and Pekin Union Ry. Co. v. United States, 93 I.C.C. 3 at page 9: "In the interchange of traffic between carriers it is the ordinarily accepted practice for the receiving line to designate tracks within a reasonable distance of the intersection of its rails with those of a connecting carrier * * *."

Englewood Yard and transporting them to Belt's yard should now be borne by T&NO.

The Commission's decision denying Belt's requested relief set forth several answers to these contentions. First and foremost, as in the prior 1930 proceeding, was Belt's nemesis, Baltimore & Ohio Railroad Co. v. United States, supra. While the Commission was of the opinion that allegations of different statutory provisions from those relied on in the 1930 case, 168 I.C.C. 260, supra, rendered res judicata inapplicable, nevertheless, it considered Baltimore was as fully controlling in this, as in the former, proceeding. With this reasoning, we are in full accord and need only briefly mention later the other and alternative grounds relied on by the Commission.

In Baltimore the Supreme Court reversed a Commission order respecting charges for moving certain westbound through traffic from the connecting railroads east of the Mississippi across the river to connecting lines west of the Mississippi. The actual transporting was done by a terminal carrier jointly owned by the west and east side lines. The prior practice was for the west side lines to bear the expenses of moving westbound through cars across the river. The west side lines complained to the Commission, charging that the practice was unjust, unreasonable and illegal. The Commission found the practice to be unjust and unreasonable and ordered it discontinued, i. e., the east side railroads would have to bear the expense of delivering westbound cars to the west side of the river. The Commission's order was affirmed by a statutory three-judge court. But on appeal, the Supreme Court reversed and set aside the order. The Court pointed out that the cost complained of had been assumed by the west side lines to enable them to compete with other railroads west of the river who made no charge for the cross-river transfer. No change had been ordered by the Commission in the method for the actual handling of the traffic. The controversy, the Court reasoned, was basically financial, i. e., one of divisions or apportionments of revenues derived from through traffic. The Court stated that the word "practice" as used in the provisions relied (§ 1(6), (11) and § 15(1)) on by the west side lines did not include the method used by the connecting carriers for their divisions of rates or revenues.

But the Court went further and held that even if the matter in controversy were a "practice" within the meaning of the Act, the Commission's order was not authorized. This was so since no evidence was produced as to the propriety of divisions between the connecting carriers. "There is a strong presumption that the general level of * * * [the connecting carriers'] * * * rates has been adjusted to include reasonable compensation for the services covered by them," 277 U.S. at page 300, 48 S.Ct. at page 523, 72 L.Ed. at page 891. That evidence tending to show that usually when interchange is effected by means of an intermediate carrier, the delivering carrier bears the cost of switching was not sufficient to invalidate the existing arrangement was made clear by the Court, for "* * * [S]uch a practice does not tend to prove that it is unjust or unreasonable for the appellee lines, in order to meet competition of other west side lines, to bear the cost of transfer * * *."

The Court, for there and here, made plain the real nature of the problem:

"The merits of the changes made by the order cannot be determined without a consideration of facts substantially similar to those specified in paragraph (6) of section 15 relating to the division of joint rates." 277 U.S. at page 301, 48 S.Ct. at page 523, 72 L.Ed. at page 891.

With the Baltimore obstacle firmly in its path, it is hardly surprising that a good deal of Belt's efforts here are attempts to demonstrate that this case involves different facts, questions of law, issues, and policy considerations. We are unconvinced that the clearly stated principles of that case are not directly applicable to the one at bar.

Belt's principal contention that the cases are distinguishable is that in Baltimore the questions were purely *financial* in that no change was sought or ordered by the Commission in the actual handling of the traffic. The only change ordered was that the east side lines were to pay the crossing charges on the westbound through traffic which in turn could only have the effect of changing divisions but without hearing or consideration of the factors required by § 15(6) of the Act.[9] In contrast Belt insists that here no change in divisions is sought while a change in operations is, i. e., T&NO should merely be required to move the specified cars.

But, of course, this contention will not bear analysis. The Supreme Court did not rely on changes in divisions of revenue having been expressly sought or ordered by the Commission. Indeed it recognized that such had not been done. It merely reasoned that a change in the divisions was the necessary impact of the order and without evidence of the type required by the Act, note 9, supra, demonstrating that currently established divisions were unreasonable because of the crossing charges, the Commission could not order the east side lines to pay them.

Laying aside the particular wording of the formal prayers for relief, is there any real difference in what Belt is seeking here? Is not the interchange "burden" of which Belt complains merely the expense of transporting these cars? Indeed, Belt itself almost said as much in its brief before the Commission: "Perhaps the most satisfactory arrangement, all things considered, would be for Belt to continue to perform the entire service and be reimbursed by defendant for the transfer from Englewood to complainant's yards, with those yards being the point of interchange to complainants." It is not to seize on what Belt now says may possibly have been an unfortunate statement as an admission[10] controlling the case that we, like the Commission, make note of this. It is merely to highlight the fact that the matter in controversy here is basically precisely the same as involved in Baltimore.

Nor do we find persuasive Belt's contention that the Baltimore case, involving as it did a terminal carrier with re-

9. § 15, par. (6): "*Commission to establish just divisions of joint rates, fares, or charges; adjustments.* Whenever, after full hearing upon complaint or upon its own initiative, the commission is of opinion that the divisions of joint rates, fares, or charges * * * are or will be unjust, unreasonable, inequitable * * * the commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers * * *. In so prescribing and determining the divisions * * the commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also * * * any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare or charge."

10. Counsel should feel no responsibility for an unwise argumentative statement. Belt's formal complaint filed before the Commission set forth in plain terms:

"Complainants believe that an arrangement under which HB&T power and crews would continue to perform the interchange work both ways between the Englewood Yard and the two HB&T yards, acting as agent for T&NO in making the return trips from Englewood Yard with T&NO's cars for delivery on designated interchange tracks in the Settegast and New South yards, where interchange would take place, and payment by T&NO to HB&T of the cost of such return trips, would be the most practicable and satisfactory way of providing for a just and reasonable interchange arrangement."

And, as a matter of fact, in the ultimatum letter of November 16, 1953, Belt laid the ground for both:

"3. Belt is willing to continue to perform the work of transferring T&NO cars from * * * Englewood * * * to * * * Settegast and South yards of Belt, if T&NO will pay the cost thereof."

quired published tariffs for service for its proprietors, should be distinguished from this case since here the Belt operates as an agent for its proprietors under contract without publishing tariffs covering such service. While, as Belt says, the Commission in the 1930 case, 168 I.C.C. 260, supra, may or could have dismissed that proceeding because at that time Belt had no standing as an operating agent and was constructively equivalent to the independent terminal carrier in Baltimore, the subsequent change in the Commission's rule, Terminal Allowance at Minnesota Transfer, 268 I.C.C. 5, is immaterial in assaying Commission action in the 1954 case.

Belt, by testimony that since the manner of interchange had never entered into the determination of divisions, contends that this takes the case completely from under the ruling of Baltimore. But the Commission was not compelled to attribute to this general testimony the effect advocated by Belt. As we have shown, it is not really the *manner* of interchange, but the *expense* of delivering these cars which is being complained of. As such, an order of the type sought by Belt could not but have precisely the same effect as that condemned in Baltimore. There was ample evidence as well that in fixing divisions terminal costs, whether done by tariff charges paid, or costs incurred on a user basis, inevitably are evaluated. In this respect, it mattered not whether Belt's lines considered the *manner* of the interchange, i. e., by Belt's switchers and crews or T&NO's. They certainly knew of and presumably weighed as desired the as-

certained monthly pro rata share of Belt's operating costs.

The general negative evidence adduced by Belt is not that required by Baltimore in this situation which must be "substantially similar" to that specified in § 15 (6), note 9, supra. The cost of the movement by Belt, of course, is known. Some evidence indicated that it was as much as $100,000 each year. If this is now adequately reimbursed by divisions neither the arrangement, nor the 1912 contract, nor the resulting expense is unfair. If it is not, then this must be shown either so a new division will be made or the interchange arrangement altered.

Under the view we have taken of this case, we have assumed *arguendo* a power in the Commission to order modification of interchange arrangements. Consequently, it is unnecessary to discuss Belt's complaint that the Commission was erroneously of the opinion that it was powerless to grant the requested relief even if Baltimore did not prohibit it. Citing several cases,[11] Belt contends that the Commission's sweeping powers given by the Act over interchange arrangements may accurately be described at the present time as plenary and that only a completely unrealistic reading of Peoria & Pekin Union Ry. Co. v. United States, 263 U.S. 528, 44 S.Ct. 194, 68 L.Ed. 427, would make that case [12] an obstacle to the Commission's authority to act under the cited provisions of the act, note 6, supra. Belt has simply failed to meet the requirements if the power exists.

The Commission's conclusions had ample record basis on evidence and find-

11. Missouri & Illinois Coal Co. v. I. C. R. R. Co., 22 I.C.C. 39; Doran & Co. v. N. C. & St. L. Ry., 33 I.C.C. 523; Chamber of Commerce of Newport News v. S. Ry. Co., 23 I.C.C. 345; Omaha Grain Exchange v. G. N. Ry. Co., 47 I.C.C. 532; Investigation of Seatrain Lines, Inc., 206 I.C.C. 328; United States v. Pennsylvania R. Co., 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499; Seatrain Lines v. Pennsylvania R. Co., 3 Cir., 207 F.2d 255; Seaboard Air Line R. Co. v. United States, D.C.Va., 131 F.Supp. 129, af-

firmed 349 U.S. 902, 75 S.Ct. 579, 99 L. Ed. 1239.

12. Belt states that a careful reading of that case, the legislative history of the cited portions of the statute, and other cases in point conclusively demonstrates that the cited sections, note 6, supra, are applicable to the present fact situation. Among the cases cited: United States v. Pennsylvania R. Co., supra; United States v. Michigan Portland Cement Co., 270 U.S. 521, 46 S.Ct. 395, 70 L.Ed. 713; In the Matter of Service Order 85, 256 I.C.C. 523.

ings after application of proper standards. None of the procedural complaints have merit.

The Order is affirmed and the Complaint dismissed.

Dismissed.