449 F.2d 439
 AMERICAN TELEPHONE AND TELEGRAPH COMPANY and Associated Bell System Companies, The Western Union Telegraph Company, Air Transport Association of America, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,
The Western Union Telegraph Company, Aerospace Industry Assoc. of America, Inc., National Retail Merchants Association, American Trucking Associations, Inc., Association of American Railroads, and National Association of Motor Bus Owners, Intervenors.
 Nos. 931-933.
 Docket 35845.
 Docket 71-1005.
 Docket 71-1021.
 United States Court of Appeals, Second Circuit.
 Argued May 6, 1971.
 Decided July 22, 1971.
 
 COPYRIGHT MATERIAL OMITTED Hugh B. Cox, Washington, D. C. (E. Edward Bruce, Washington, D. C., Horace P. Moulton, F. Mark Garlinghouse and C. Duane Aldrich, New York City, on the brief), for American Telephone and Telegraph Co. and Associated Bell System Companies.
 Melvin Richter, Washington, D. C. (Jack Werner, Washington, D. C., and Richard C. Hostetler, New York City, on the brief), for The Western Union Telegraph Co.
 William E. Miller, Washington, D. C. (James E. Landry, Herbert E. Forrest, Steptoe & Johnson, Charles R. Cutler, John L. Bartlett, Kirkland, Ellis, Hodson, Chaffetz, Masters & Rowe, Calvin Davidson, Stephen L. Babcock and Reavis, Pogue, Neal & Rose, Washington, D. C., Philip J. Hogan, J. Richard Street and Charles F. McErlean, Jr., Chicago, Ill., and R. C. Hatch, Utica, N. Y., on the brief), for Air Transport Assn. of America, Aeronautical Radio, Inc., United Air Lines, Inc., Eastern Air Lines, Inc., Mohawk Airlines, Inc. and Emery Air Freight Corp.
 Edward J. Kuhlmann, Washington, D. C. (Richard E. Wiley, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, F.C.C., Washington, D. C., and Richard W. McLaren, Asst. Atty. Gen., and Howard E. Shapiro, Dept. of Justice, Washington, D. C., on the brief), for F.C.C. and the United States.
 Harold F. Reis, Washington, D. C. (Arthur Scheiner and Wilner, Scheiner & Greeley, Washington, D. C., on the brief), for Aerospace Industries Assn. of America, Inc.
 Roy R. Russo, and Cohn & Marks, Washington, D. C., on the brief, for Assn. of American Railroads.
 William H. Borghesani, Jr., Robert R. Tiernan, Keller & Heckman, Washington, D. C., on the brief, for National Retail Merchants Assn.
 Richard P. Taylor, and Steptoe & Johnson, Washington, D. C., on the brief, for National Assn. of Motor Bus Owners.
 Before LUMBARD, SMITH and KAUFMAN, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Petitioners seek review of a decision of the Federal Communications Commission, adopted June 10, 1970, released June 18, 1970, and reported at 23 F.C.C. 2d 606, and a memorandum opinion and order of the Commission on reconsideration, adopted December 9, 1970, released December 15, 1970, and reported at 26 F.C.C.2d 862. Those decisions involve certain provisions in tariffs applicable to a bulk private-line communications service offered by American Telephone and Telegraph Company and its Associated Bell System Companies (hereinafter collectively referred to as AT&T) and Western Union Telegraph Company (Western Union) at rates lower than those applicable under the general private-line tariffs. The tariff provisions in question here allow certain categories of customers to combine their communications requirements to qualify for these lower rates. The service itself is known as "Telpak" and the tariff provisions at issue are called the "Telpak sharing provisions." The Federal Communications Commission held that these provisions were unlawfully discriminatory in violation of section 202(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 202(a), and by a prescription order under section 205 of the Act, 47 U.S.C. § 205(a), required the carriers to cure the discrimination by extending Telpak sharing to all private-line customers.
 
 
 2
 We affirm the Commission's holding that the Telpak sharing provisions are unlawfully discriminatory; but we reverse its prescription of unlimited sharing for failure to conform to the requirements of § 205(a) that the prescribed practice be found to be "just, fair, and reasonable" and that the prescribed rates be found to be "just and reasonable." We therefore remand this case to the Commission for a hearing and determination as to what remedy for the discriminatory sharing would satisfy those statutory requirements.
 
 FACTS
 
 3
 The normal private-line service offered by the common carriers, AT&T and Western Union, provides a customer with a means of continuous communication between specified locations without the carrier having to establish connections for each call or message, that is to say, without having to go through the usual call-and-hook-up process. Such service is not limited to conventional telephone apparatus; it also includes, at long or short distances, reproduction of documents and photographs, data transmission, remote metering, signaling, and other highly sophisticated communications services. The Telpak service is a rate offering under which private-line customers with sufficient bulk communications needs may obtain private-line communications circuits from AT&T or Western Union at substantial discounts below the rates which they would have to pay for the equivalent number of circuits at the ordinary private-line rates.
 
 
 4
 AT&T initiated the Telpak service in 1961 in order to be competitive with private point-to-point microwave communications systems which had emerged to meet the growing industrial and governmental demand for bulk communications. These private microwave systems had become generally available to large communications users in 1960 as a result of a liberalized licensing policy adopted by the F.C.C. in Allocation of Frequencies in the Bands Above 890 Mc, 27 F.C.C. 359 (1959), 29 F.C.C. 825 (1960). In the Above 890 Mc case, the Commission allocated frequencies for the use of private microwave systems by private firms and permitted the licensing of those systems. As part of this new policy, the Commission in Above 890 Mc allowed certain specified private microwave customers — regulated entities such as common carriers, pipeline companies, and other public utilities, as well as federal, state, and local governmental agencies — to build and operate shared private microwave systems. Shared use of the same facilities by other users was not permitted.
 
 
 5
 AT&T offered Telpak in order to match generally the cost and service characteristics of private microwave systems. At that time, Telpak consisted of four categories of service between any given pair of points designated by the customer. Those categories were called Telpak A, B, C, and D and were discount offerings for users of the equivalents of 12, 24, 60, and 240 voice channels respectively.
 
 
 6
 As part of the Telpak offering, and again in order to compete with private microwave, AT&T included provisions in the tariff, which allowed certain private-line users, whose communications requirements were not large enough to qualify them for Telpak on their own, to combine their needs and thus to become eligible to receive the benefit of the Telpak rates. It limited this Telpak sharing to those groups eligible under the Above 890 Mc decision to share private microwave facilities, in order to offer common carrier service comparable to private system alternatives, and because it seemed likely that private microwave competition would be most severe in the portion of the market represented by those eligible to share private systems. Thus, Telpak sharing was available only to governmental agencies, right-of-way companies such as pipelines and railroads, common carriers, public utilities, and other organizations whose rates and charges were regulated by a governmental entity. It is these sharing provisions that are the subject of the instant case.
 
 
 7
 Soon after Telpak's inauguration in 1961, the F.C.C. began an investigation of Telpak rates, which resulted in findings which compared common carrier private-line charges with private microwave costs. Eventually, in 1964, the Commission held that the rates for Telpak A and B, the two categories of Telpak designed for relatively low-volume users, were unlawfully low and not justified in terms of cost or the competition of private microwave, but that Telpak C and D were justified on grounds of competitive necessity. 38 F.C.C. 370 (1964), 37 F.C.C. 1111 (1964), 38 F.C.C. 761 (1965), aff'd, American Trucking Ass'ns v. F.C. C., 126 U.S.App.D.C. 236, 377 F.2d 121 (1966), cert. denied, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874. Following judicial affirmance of the Commission's decision, Telpak A and B were eliminated, and Telpak is now limited to the C and D classifications for 60 and 240 voice channels respectively. To obtain Telpak C or D bulk rates, customers must pay for 60 or 240 voice channels, even though their actual channel requirements may be less. For those that can take advantage of the Telpak rates, the discount is substantial — 53.4% for Telpak C and 57.4% for Telpak D.
 
 
 8
 Although Telpak C and D were found to be competitively justified in the original Telpak proceeding, the Commission did not determine whether these rates were compensatory. The rates for Telpak C and D subsequently have been increased on two different occasions, but the Commission has not yet decided whether Telpak C and D are compensatory. That question is before the Commission in Docket No. 18128 — a proceeding which now involves the rates for most AT&T interstate private-line services, including Telpak. Docket No. 18128 is currently in a hearing status before the Commission and involves questions as to the structure and level of Telpak rates, as well as the competitive justification for the Telpak rate offering.
 
 
 9
 On July 13, 1966, the Commission amended its private microwave rules to permit wider sharing of private microwave systems, on the grounds that there was no evidence that it would cause an undesirable proliferation of private microwave systems so as to cause substantial injury to the carriers or the public, but that it would result in the fuller and more efficient utilization of microwave frequencies.[1] In response to this change, several communications users who were excluded from Telpak sharing made an informal complaint to the F.C.C.,[2] and the Commission requested AT&T to advise it as to AT&T's intentions concerning revisions in the Telpak sharing provisions to provide for wider sharing in light of the Commission's action in eliminating sharing restrictions on private microwave. AT&T advised the Commission of its conclusion that there was no competitive justification for any selective extension of Telpak to the complaining users and that unlimited Telpak sharing equivalent to that permitted by the Commission's new private microwave sharing rules would ultimately result in the elimination of the Telpak service offering. AT&T argued that the amendment of the Commission's private microwave sharing rules did not by itself justify a modification of the Telpak sharing regulations.
 
 
 10
 As a result of AT&T's refusal to permit a limited extension of sharing, the Commission, on May 19, 1967, began on its own motion an investigation which resulted in the orders now under review. The purpose of this investigation, according to the Commission, was to determine whether under § 201 (b) or 202 (a) of the Communications Act the present Telpak sharing limitations constituted an unlawful discrimination in favor of a specified class of users to the prejudice of all other users, and if so, whether the Commission should prescribe different sharing regulations under § 205(a) of the Act.[3] The relatively narrow issue did not include a determination of the propriety of Telpak itself or of any existing or proposed rate structure, which are at issue in Docket No. 18128.[4] At the same time, the Commission ordered that the Hearing Examiner presiding at the hearing was not to prepare an initial or recommended decision, but was merely to certify the record to the Commission, and that the Chief of the Commission's Common Carrier Bureau was thereafter to issue a recommended decision, to be subject to exceptions and oral argument.
 
 
 11
 AT&T, Western Union, and all carriers concurring in the Telpak tariffs of either company were made respondents. In addition, six intervenors representing those presently eligible to share (the government, the airlines, the railroad, the truckers, the motor bus owners, and the public utilities) appeared at the hearing in support of the existing limited sharing provisions, and six groups of intervenors not presently eligible to share (representing the aerospace industry, the hotel and motel industry, the petroleum industry, manufacturers, retail merchants, and the press) appeared in support of a limited extension of sharing restricted to themselves alone.
 
 
 12
 The Chief of the Common Carrier Bureau of the Commission appeared by counsel, who later participated in the proceedings by cross-examining witnesses, by expressing views and submitting pleadings on disputed interlocutory rulings, by requesting data from the respondent carriers and other parties which were offered for the record, and by submitting the testimony of Dr. William H. Melody, a member of the Bureau's economic studies division. From the beginning, the petitioners objected to the multiple role of the Common Carrier Bureau in preparing the order of investigation, in actively participating in the hearing, in issuing a recommended decision through its Bureau Chief, in privately presenting its views to the Commission on the final decision, and in participating in the draft of the final decision. They particularly objected to the participation of Dr. Melody who was the only witness offered by the Bureau at the hearing and who recommended that the Commission require unlimited Telpak sharing — the course of decision ultimately adopted.
 
 
 13
 During the twenty-seven days of hearings, AT&T and the other parties supporting the existing Telpak sharing regulations offered evidence to show that the discrimination in those regulations between the customers eligible to combine their communications requirements to qualify for Telpak and those ineligible to share Telpak was justified by the nature and extent of existing private microwave competition. Specifically, they attempted to show that the sharing regulations had been designed to meet such competition at the time they were introduced; that customers eligible to share were by far the most significant users, both actual and potential, of private microwave systems since such customers had unique communications needs and capabilities which made them likely users of such systems; that other customers who were ineligible to share Telpak were less likely to turn to private microwave systems; and that the Commission's 1966 expansion of the private microwave sharing privileges had not measurably enhanced the general appeal of private microwave to customers ineligible to share Telpak. The petitioners did not allege that there was a cost differential between the private-line service provided under Telpak sharing rates and the private-line service provided under the nonsharing rates. As stated above, the Bureau offered the testimony of Dr. Melody who advocated unlimited sharing of Telpak.
 
 
 14
 About seven months after the hearings closed, the Bureau Chief issued his recommended decision. He concluded that the existing limited Telpak sharing provisions were unlawfully discriminatory under § 202(a) of the Communications Act, and he recommended that the carriers be ordered to file tariff revisions eliminating the discrimination. With respect to the prescription question, however, he concluded that "the record in this proceeding does not establish an adequate basis for a definitive prescription by the Commission of specific measures that should be taken by the carriers to eliminate the unlawful discriminations and preferences found herein to exist." 23 F.C.C.2d 639, 658 (1969). Finally, he found that the Telpak sharing practices were not in accord with the provisions of the tariff, since the tariff referred to shared use of facilities, while in fact the customers did not share the same facilities.[5]
 
 
 15
 Petitioners filed exceptions to the recommended decision, attacking the conclusion that the existing Telpak sharing regulations were unlawfully discriminatory. They also argued that the commingling by the Bureau of its function as an advocate in the hearings and its role as decision-maker was prejudicial and caused an erroneous result, and that the Commission should have consolidated this proceeding with those concerning the overall rate levels of Telpak and its compensatory justification.
 
 
 16
 After hearing oral argument on these exceptions, the Commission issued its decision on June 18, 1970. It adopted the Bureau Chief's finding that the existing Telpak sharing provisions were unlawfully discriminatory. It held that the petitioners had the burden of presenting "some persuasive and tangible evidence" that "those benefiting from the discrimination have an alternative of satisfying their communications requirements from a substitute source of supply and that they will shift to the substitute source unless the discrimination is maintained," 23 F.C.C.2d at 613, and it concluded that:
 
 
 17
 "it has not been shown that shared private microwave, has been an attractive alternative for certain groups, i.e., the airlines, truckers, and motor bus carriers and that at best, it possibly has been attractive for other groups, such as the railroads, power, and petroleum industries because of their particular communications needs and their ownership of rights-of-way." 23 F.C. C.2d at 620.
 
 
 18
 The Commission also adopted the Bureau Chief's finding that the carriers' practices did not conform to the language of the tariff.
 
 
 19
 On the prescription question, however, the Commission did not adopt the Bureau Chief's conclusion that the record did not establish an adequate basis for a specific prescription. Instead, it undertook pursuant to § 205 of the Act to prescribe new regulations by ordering the carriers to file revised tariffs providing for unlimited Telpak sharing. In making this prescription, the Commission eschewed a finding that the prescribed practice of unlimited sharing would be "just, fair and reasonable" — the precise words of § 205(a) — or that the charges resulting from the new practice would be "just and reasonable" — the wording of § 205 (a).[6] Rather, it stated that it had weighed all the alternatives and their effects and had decided that unlimited sharing was the best of the alternatives on the record before it to eliminate the existing discrimination.
 
 
 20
 It found that the elimination of all sharing — the alternative which the carriers had stated that they would adopt if the recommended decision was affirmed without modification — would result in a magnification of the discrimination between users able to obtain the Telpak rate discount without sharing and those users who could not obtain such a discount, and hence that this alternative would not be just, fair, or reasonable. The Commission also found that prescribing a selective extension of Telpak sharing to certain private-line users not then entitled to share, but not to all, would be similarly unacceptable, because there would be no rational basis for drawing the line to allow some users to share but not others. Thus, the Commission concluded that unlimited sharing was the best alternative available and that, moreover, it would not lead to the adverse revenue impact which the carriers had predicted. The Commission recognized that unlimited sharing might result in the eventual demise of Telpak rates or raise questions as to the competitive or other justification for the Telpak rates, but it reserved for Docket No. 18128 consideration of these potential consequences of its order.
 
 
 21
 Finally, the Commission rejected the petitioners' contentions that the hearing examiner must issue a decision, that the Bureau could not properly participate in the proceeding as an advocate and also issue a recommended decision, and this proceeding should be consolidated with those dealing with the overall rate structure of Telpak and the compensatory justification for it.
 
 
 22
 Petitioners filed petitions for reconsideration of the Commission's decision and order, renewing their attack on the Commission's findings as to discrimination under § 202(a), and in addition arguing that the Commission had failed to make the requisite statutory findings under § 205(a) that its prescription of unlimited sharing was "just, fair, and reasonable." The F.C.C. denied these petitions in all respects now material in a memorandum and order adopted December 9, 1970.[7]
 
 
 23
 Petitioners sought review of the Commission's orders in this Court and various parties intervened. On March 29, 1971, we granted petitioners a stay pending review.
 
 DISCUSSION
 
 24
 On this appeal, petitioners and the intervenors supporting them raise three major issues: (A) whether the Commission erred in holding the existing limited Telpak sharing provisions unlawfully discriminatory; (B) whether the Commission's prescription of unlimited sharing was invalid because it was made without the findings required by § 205 (a) of the Act or because it rested upon the assumption that the overall Telpak rate structure was unlawfully discriminatory, although the validity of Telpak rates overall was not an issue before the Commission in this proceeding; and (C) whether the Commission's procedures, particularly the commingling of adversary and decisional functions in the Common Carrier Bureau, violated § 409(c) of the Communications Act and deprived petitioners of due process of law.[8] We uphold the Commission on the first and third points, but we reverse its prescription of unlimited sharing and remand the case for a further hearing as to the proper remedy.
 
 
 25
 A. UNLAWFUL DISCRIMINATION. The only justification which AT&T advanced in the hearing to support the existing limited Telpak sharing regulations was competitive necessity, that is, that the discriminatory sharing practice was necessary in order for AT&T to meet the competition of private microwave. To establish this justification, AT&T offered evidence to show that all of the customers privileged to share Telpak are more likely to substitute private microwave service for common carrier service than are any of the customers unable to share Telpak.
 
 
 26
 The Commission recognized that if the discriminatory sharing practice could be shown to be a necessary competitive response to the competition of private microwave, that is, if it could be shown that those benefiting from the existing discrimination would shift to private microwave unless the discrimination were maintained, then the existing discrimination would not be unlawful. The Commission concluded, however, that AT&T had not proved the competitive necessity for the existing sharing practice. It found that the evidence did not support AT&T's contention that but for the discrimination, those eligible to share Telpak would shift to shared private microwave. On the contrary, according to the Commission, the practice of granting the Telpak sharing privilege to some customers and denying it to others is totally unrelated to the likelihood that the privileged customers would choose either Telpak or private microwave. Hence, the Commission concluded, the existing limited Telpak sharing practice was unlawfully discriminatory under § 202(a) of the Act.
 
 
 27
 AT&T's first challenge to this conclusion is that the Commission erred in considering only the competition offered by shared private microwave, rather than considering the competition of all forms of private microwave. According to AT&T, shared Telpak competes with all private microwave systems, including those operated by a single user, and hence the Commission should have looked at the competitive justification for the sharing regulations which is offered not only by shared private microwave but by all forms of private microwave. In support of this argument, AT&T points to evidence showing that a large part of all private microwave mileage consists of unshared systems devoted to customers entitled to share in Telpak.
 
 
 28
 We reject this contention. AT&T ignores the basic thrust of the Commission's decision in this regard. The Commission was determining whether the limitation on sharing Telpak was justified as a competitive response to private microwave, and hence the focus of its assessment was on whether the limitations on Telpak sharing practices were responsive to differences in competitive characteristics between those potential microwave users who are permitted to share Telpak, and those who are not. As we have noted, the Commission found that those Telpak users in the group now favored by the Telpak sharing rates who are specially attracted to private microwave are motivated primarily by characteristics peculiar to microwave transmission, such as greater flexibility, with which Telpak doers not compete and which it cannot neutralize merely by offering Telpak sharing selectively to those users. Given this conclusion, to examine more deeply into the relative attractiveness of shared private microwave as compared with other forms of private microwave would have been superfluous, if not entirely irrelevant.
 
 
 29
 In making this argument, then, AT&T is trying to go beyond the narrow issue of the competitive justification for the discriminatory Telpak sharing practice and to include all the reasons Telpak users view private microwave as an alternative. Whatever the significance of those other reasons to the maintenance of Telpak itself, they have no relevance to limiting those who can share Telpak.
 
 
 30
 It is true that the Commission, in determining the competitive alternatives to the limited Telpak sharing practice, gave particular emphasis to shared private microwave. But this was surely appropriate since the sole justification for the initial limitation on Telpak sharing to certain specified users was that in 1961 those were the only groups authorized to share private microwave systems. See the original Telpak proceeding, supra, 37 F.C.C. at 1115, aff'd American Trucking Ass'ns v. F.C.C., supra. Hence, in deciding whether such limitation was still competitively necessary, it was only natural that the Commission should look primarily to the alternative provided by shared private microwave. It found no indication in the record that microwave sharing growth has been affected by the limitation on Telpak sharing or would be affected by the elimination of that limitation; rather, it found that insofar as private microwave is an attractive alternative at all, it is for reasons with which common carrier service cannot compete. In this regard the Commission's conclusion is fully supported by the record.
 
 
 31
 The petitioners' second challenge to the F.C.C.'s finding of unlawful discrimination is that the Commission erred in requiring AT&T to show more than a probability that a significant number of customers would shift to private microwave absent the discriminatory Telpak sharing practice. The Commission required a showing that those eligible to share Telpak would in fact shift to private microwave if the existing discrimination were not maintained. According to petitioners, this standard is too stringent and is incapable of proof except after the fact. Moreover, petitioners argue, the Commission, in applying that standard to certain testimony, arrived at conclusions that were too vague and indefinite to reveal the reasons for its decision.[9]
 
 
 32
 We reject this contention, and we need not spend much time on an explanation. To accept AT&T's contention that the mere probability of a shift to a substitute source justifies the discriminatory sharing regulations would be to accept a criterion that is far too vague in relation to § 202(a) of the Act. The standard which the Commission actually used here is more in accord with the case law of competitive justification developed under a similar statutory provision of the Interstate Commerce Act, where discrimination has been the subject of extensive litigation. In Interstate Commerce Commission v. Chicago G. W. Ry., 209 U.S. 108, 119, 28 S.Ct. 493, 52 L.Ed. 705 (1908), for example, the Court required carriers to demonstrate that the competition is "genuine and not a pretense."
 
 
 33
 Similarly, the record does not support petitioners' contention that, in applying that standard, the Commission's assessment of certain testimony was too vague and indefinite. Rather, it was the testimony itself that was vague and indefinite and that is precisely why it lacked the necessary precision to justify the existing discrimination. On the whole, the Commission applied the correct standard and its conclusion is supported by substantial evidence.[10]
 
 
 34
 B. PRESCRIPTION. As discussed above in the statement of facts, the Commission, after finding the existing Telpak sharing regulations to be unlawfully discriminatory under § 202(a), proceeded to order the common carriers under § 205 (a) to permit any and all private-line customers to share in order to get the benefits of the Telpak rates. In doing so, it stated that any other remedy would be unacceptable and hence that unlimited sharing was the best alternative available.
 
 
 35
 Petitioners challenge the Commission's prescription on two grounds: (1) that it was made without the requisite statutory findings that the prescribed practice is just, fair, and reasonable and that the rates resulting therefrom are just and reasonable; and (2) that it was based on an unwarranted assumption — that the overall Telpak rate structure absent any sharing would be unlawfully discriminatory. We agree.
 
 
 36
 The Commission's authority to prescribe rates and practices is derived from § 205(a) of the Communications Act. That authority is not unlimited. To prescribe a practice the Commission must find that it is "just, fair and reasonable," and to prescribe a rate it must find that the rate is "just and reasonable."[11] Valid findings of this kind are therefore essential to any exercise by the Commission of its authority under § 205 (a).
 
 
 37
 In this case, however, instead of making the essential statutory finding that unlimited sharing would be a just, fair, and reasonable practice, the Commission merely stated that it viewed unlimited sharing as "the best of the alternatives discussed herein." 23 F.C.C.2d at 624. In the face of objections that this statement did not comply with the statutory requirements, the Commission reiterated the statement in its orders on reconsideration and on motions for a stay pending judicial review, and continued to refuse to make a finding in the terms of the statute. This refusal, then, seems to have been considered and deliberate and requires the conclusion that the Commission was not willing to make a definitive finding that unlimited sharing was a just, fair, and reasonable practice, but rather believed that it could support its prescription order by a more qualified finding.
 
 
 38
 The Commission's own Common Carrier Bureau had found that the record did "not establish an adequate basis for a definitive prescription by the Commission." 23 F.C.C.2d at 658. The Commission, however, apparently tried to avoid any direct challenge to this finding by assuming that, even if the record were inadequate to allow it to make a definitive finding that the method it prescribed was just, fair, and reasonable, it could nonetheless choose among the alternative remedies discussed on the record and select the one which it believed to be the best.
 
 
 39
 The fallacy of this assumption is obvious. The fact that one method of removing the discrimination seems preferable on an incomplete record does not in itself establish that that method would be shown on a complete investigation to be just, fair, and reasonable. Since the Commission did not find evidence in the record to support a conclusion that unlimited sharing would be a just, fair, and reasonable remedy, § 205(a) required the Commission to leave the matter of prescription for resolution on an adequate record after further proceedings.
 
 
 40
 We cannot accept the Commission's characterization of its finding as the semantic equivalent of that required by the statute. In the face of the Commission's repeated and deliberate refusal to make a finding in terms of the statute, this argument loses any force it might otherwise have had. In any event, it is settled that the absence of a basic or jurisdictional finding of the kind here involved cannot be justified on the ground that some other and different finding by inference or implication meets the statutory standard. See United States v. Baltimore & O. R. R., 293 U.S. 454, 463-464, 55 S.Ct. 268, 79 L.Ed. 587 (1935); United States v. Chicago, M., St. P. & P. R. R., 294 U.S. 499, 510-511, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). See also United States v. Carolina Carriers Corp., 315 U.S. 475, 488-489, 62 S.Ct. 475, 86 L.Ed. 971 (1942).
 
 
 41
 A similar deficiency exists in the Commission's refusal to find that the Telpak rates, as extended by its prescription order, are just and reasonable. The impact of its order requiring unlimited sharing is to fix and prescribe rates for application to an enlarged group of customers; and since the lower Telpak rates are not now available to this enlarged group, the order in effect is equivalent to an order requiring a widespread rate reduction. Under § 205(a) the Commission cannot prescribe a rate without finding that the rate prescribed is just and reasonable. The Commission here made no such finding with respect to the Telpak rates as extended and applied by its order, but on the contrary expressly disclaimed making any such finding. Its order is therefore invalid for not complying with the requirements of the Act.[12]
 
 
 42
 There is, moreover, another fatal defect in the Commission's prescription order. Since the Commission did not attempt to find a basis in the record for a finding that unlimited sharing was just, fair, and reasonable, it turned to an examination of alternatives and rested its prescription of unlimited sharing primarily on the assumption that the major alternative — eliminating all sharing — would be unjustly discriminatory and would not be just, fair, and reasonable. As petitioners argue, that assumption was unwarranted.
 
 
 43
 It is clear from the Commission's opinion that the primary factor leading to its prescription was its belief that the Telpak system without any sharing at all would be unlawfully discriminatory. In analyzing the alternatives, it stated that the elimination of sharing was unacceptable because it would result in a magnification of the discrimination between the large individual users able to qualify for the Telpak rates without sharing and the smaller users who could not obtain such discount. 23 F.C.C.2d at 622; 26 F.C.C. 2d at 864.
 
 
 44
 The implications of this reasoning are plain. If Telpak without sharing unlawfully discriminates between bulk users and small users, then the overall Telpak rate structure is unlawful, for the essence of Telpak is a reduced rate limited to large volume users. The prescription making the reduced rate available to all users, large and small, therefore has the practical effect of overturning the Telpak rate structure itself — not just the existing limited sharing provisions. Indeed, the Commission did not shrink from this conclusion, for it stated:
 
 
 45
 "Assuming arguendo that unlimited sharing might result in the eventual demise of Telpak rates or raise questions as to the competitive or other justification for the Telpak rates, we do not view these as fatal impediments to the adoption of unlimited sharing. * * * We have heretofore stated that we recognize that our decision herein may have an impact on the Telpak rates, rate structures and revenue requirements * * *."[13] 23 F.C. C.2d at 623.
 
 
 46
 In effect, then, the Commission rested its prescription of unlimited sharing on the finding that the basic Telpak rate structure was unlawful. Such action was impermissible. The Commission made no specific finding as to the lawfulness of the Telpak rate structure nor any subsidiary findings, such as that the Telpak rate structure was unlawful because the low rates were not justified by the competition of private microwave; that the rates to large customers were not compensatory; or that for some other reason the offering of low rates to only those customers was unlawfully discriminatory. Indeed, there was no evidence on the record which would support such findings; and in any event, as the Commission itself consistently reiterated throughout the proceedings, the overall lawfulness of Telpak was not in issue here, and the evidentiary hearings before the examiner were conducted on that premise.[14] Moreover, the assumption that Telpak itself, without any sharing, is unlawfully discriminatory flies in the face of the prior Commission decision upholding the competitive justification for Telpak C and D. 38 F.C.C. 307 (1964); 37 F.C.C. 1111 (1964); 38 F.C. C. 761 (1965), aff'd, American Trucking Ass'ns v. F.C.C., supra.
 
 
 47
 For these reasons, we remand the case to the F.C.C. for further proceedings to determine what remedy for the existing discriminatory sharing practices would be just, fair, and reasonable and as to what rates resulting therefrom would be just and reasonable. We do not mean by our decision today to imply any opinion as to whether unlimited sharing can be justified as a just, fair, and reasonable remedy. We are merely remanding for consideration as to what structure can be fashioned, based on the findings required by § 205(a) and supported by adequate subsidiary findings and by a full record.
 
 
 48
 C. PROCEDURE. The petitioners' third line of attack on the F.C.C.'s decision is that the Commission's procedures violated § 409(c) of the Communications Act and deprived them of a full and fair hearing. Their major argument in this area is that it was unlawful for the staff members of the Common Carrier Bureau, especially Dr. Melody, who took an adversary position at the hearing and introduced evidence, to participate in the decision making by advising the Commission with respect to its final decision. According to petitioners, this commingling of adversary and decisional functions both violated § 409(c) of the Act and denied them due process of law.
 
 
 49
 The Commission admits the fact that the commingling occurred — it could hardly deny it — but contends that separation of functions was not required here, since this proceeding was rule making or rate making, rather than adjudication. Unless the proceeding is adjudicatory, the Commission argues, the separation of functions requirements of the Communications Act, the Administrative Procedure Act, and the due process clause do not apply. In making this contention, the Commission relies chiefly on Wilson & Co. v. United States, 335 F.2d 788, 796-797 (7 Cir. 1964), cert. denied, 380 U.S. 951, 85 S.Ct. 1082, 13 L.Ed.2d 968 (1965), a case very similar to the one at bar, where the Seventh Circuit rejected the same argument raised by petitioners here. In that case, the Court held
 
 
 50
 "that it was proper for members of the Commission's Common Carrier Bureau who were counsel of record in the hearing before the Commission to participate in the decisional process that led to the orders under review; and that this conduct did not violate section 3(a) of the Administrative Procedure Act, 5 U.S.C. § 1002(a), sections 409(c) and 205(a) of the Communications Act of 1934, 47 U.S.C. §§ 409(c), 205(a), the Commission's own rules, as well as constitutional due process." 335 F.2d at 796.
 
 
 51
 It seems to us that the dual role of the Common Carrier Bureau here, particularly that of Dr. Melody, was ill-advised. In this belief, we are supported by Kenneth Culp Davis, a leading authority on administrative law, who has stated that
 
 
 52
 "something is wrong with a system in which evidence is taken and findings are made on the record and yet counsel who are trying to win for one point of view are allowed to participate in the decision. * * * Even if the theory of this kind of rate making is that it is rule making and not adjudication, those who are trying to win for one side should not participate in the final decision. At the time of final decision the Commission should be insulated from contamination by the advocates." Davis, Administrative Law § 13.02, 1970 Supp., at 458.[15]
 
 
 53
 Similarly, the American Bar Association and the Administrative Conference of the United States have urged that, as a matter of general practice, the separation of adversary and decisional functions should be required in agency rate-making proceedings.[16] Even the Commission itself has finally responded to these criticisms and has demonstrated that it is practical to separate the prosecutorial and judging functions of the Common Carrier Bureau. In American Tel. & Tel. Co., 27 F.C.C.2d 151, 157 (1971), the Commission ruled that in a purely prospective rule-making proceeding under § 204 it would "follow the procedures recommended by the Administrative Conference" by separating the trial staff of the Bureau from those members of the Bureau that will have ex parte access to the hearing examiner or the Commission.
 
 
 54
 Nevertheless, despite our belief as to what might be desirable in such cases, we cannot see how, under present law, the commingling of functions practiced here is proscribed either by § 409 (c) of the Communications Act or by the due process clause of the Constitution. Hence, we cannot fault the Commission's procedure in this regard.
 
 Section 409(c) (1) provides:
 
 55
 "In any case of adjudication (as defined in the Administrative Procedure Act) which has been designated by the Commission for a hearing, no person who has participated in the presentation or preparation for presentation of such case at the hearing or upon review shall (except to the extent required for the disposition of ex parte matters as authorized by law) directly or indirectly make any additional presentation respecting such case to the hearing officer or officers or to the Commission, or to any authority within the Commission to whom, in such case, review functions have been delegated by the Commission under section 5(d) (1), unless upon notice and opportunity for all parties to participate." 47 U.S.C. § 409(c) (1).
 
 
 56
 By its terms, then, this provision applies only to cases "of adjudication" within the meaning of the APA, and the APA so defines "adjudication" as to exclude "rule making."[17] "Rule" in turn is defined by the APA as a "statement of general or particular applicability and future effect" and includes "the approval or prescription for the future of rates, * * * or practices bearing on any of the foregoing. * * *"[18]
 
 
 57
 Telpak and Telpak sharing are clearly rate practices. The purpose of the proceeding below was to determine whether those practices are unlawful and, if so, "whether the Commission * * * should prescribe practices and regulations for the sharing of Telpak C and D, and, if so, what should be prescribed. * * *" There is no question that the rate practice prescribed by the Commission — unlimited sharing — is for the future, and no issue of damages for past acts was involved. To adopt Professor Davis' framework, the key questions of fact here were "legislative" rather than "adjudicatory" — that is, they were matters of statistics, economics, and expert interpretation, rather than questions of whether AT&T had violated some norm and would thus be subject to restrospective sanctions or other judicial questions of who did what, when, and where. Consequently, the proceeding here was plainly rule making within the meaning of the APA, rather than adjudication, and hence the prohibition against the commingling of functions, contained in § 409 (c) of the Communications Act, does not apply.
 
 
 58
 This conclusion is supported by the fact that the similar prohibition against commingling found in the APA itself not only applies solely to cases of adjudication, but makes a specific exception for "proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers." Section 5(c) of the APA, 5 U.S.C. § 554(d).
 
 
 59
 We must reach the same conclusion with respect to the due process claim. The case law generally rejects the proposition that the combination of judicial and adversary functions is a denial of due process. See, e. g., Marcello v. Bonds, 349 U.S. 302, 311, 75 S.Ct. 757, 99 L.Ed. 1107 (1955); Harisiades v. Shaughnessy, 342 U.S. 580, 583, 72 S.Ct. 512, 96 L.Ed. 586 (1952); Belizaro v. Zimmerman, 200 F.2d 282, 283 (3 Cir. 1952). This seems to be particularly true where the proceeding is rule making or rate making. See, e. g., Wilson & Co. v. United States, supra. The issue was raised in American Trucking Ass'ns v. F. C. C., supra; and the District of Columbia Circuit, without specifically addressing itself to this question, held: "Examination of this record satisfies us that the Commission complied with all procedural requirements." 377 F.2d at 133. Professor Davis himself recognizes this, 2 Davis, Administrative Law § 13.02 (1958) at 175; and even in the passage quoted above attacking this procedure, he admitted, in referring to the Wilson & Co. case, that "[t]he Seventh Circuit may be following the present law." Davis, 1970 Supp., supra, at 458.
 
 
 60
 We cannot accept the petitioners' argument that this proceeding was in reality adjudicatory because the Commission's prescription was ancillary to an investigation of the past practice and regulations with regard to sharing. Of course, under § 205(a) of the Act, a finding that an existing practice is unlawful is a prerequisite to the prescription of a practice. But as the House Report on the APA indicated in explaining the section which defines rule making, that section "does not preclude agencies from * * dealing with past practices in prescribing rules for the future." H.Rept. No. 1890, 79th Cong., 2d Sess. 49 n. 1. See also Wilson & Co. v. United States, supra, 335 F.2d at 796-797; Midwest Television, Inc. v. F.C.C., 138 U.S.App.D.C. 228, 426 F.2d 1222, 1226-1228 (1970). Under petitioners' theory, any rule making which included an examination of past practice or experience would be transformed into adjudication — an outcome plainly at odds with the statute and case law. As shown above, the proceeding here was clearly concerned with "legislative" questions and the action contemplated was a "statement of general * * * applicability and future effect" — the requirements for a rule-making proceeding. Consequently, neither the statutes nor the cases preclude the Commission from making the best use of those experts which it may have available in order to resolve the difficult technical questions.
 
 
 61
 Petitioners also make several other contentions alleging error in the Commission's procedures in this case. We have examined those contentions and find them to be wholly without merit.
 
 
 62
 Affirmed in part; reversed and remanded in part.
 
 
 
 Notes:
 
 
 [1]
 Under this decision, those entities who were permitted intraservice sharing (sharing within the same industry), namely, public safety organizations (such as government, police, and fire departments), right-of-way companies (such as railroads, pipelines, and utilities), and other entities whose rates are regulated (such as the airlines, truckers, and bus-lines), were now permitted interservice (cross-service) sharing in the frequencies below 10,000 mc/s assigned to these services. In addition, other industries, such as manufacturing, petroleum, and mining were permitted intraservice (but not interservice) sharing on other frequencies below 10,000 mc/s
 
 
 [2]
 The complaints were made by the National Retail Merchants Association and, on behalf of the press, by the American Newspaper Publishers Association
 
 
 [3]
 The Commission's order that an investigation be held stated that the investigation would inquire into the following issues:
 "(1) Whether the practices and regulations published in the aforesaid tariffs governing the sharing of TELPAK C and D services are or will be unjust and unreasonable within the meaning of section 201(b) of the act or subject any person or class of persons to unjust or unreasonable discrimination or give any undue or unreasonable preference or advantage to any person, class of persons, or locality, or subject any person or class of persons or locality to any undue or unreasonable prejudice or disadvantage within the meaning of section 202(a) of the act;
 "(2) If any of such practices and regulations are found to be unlawful, whether the Commission, pursuant to section 205 of the act, should prescribe practices and regulations for the sharing of TELPAK C and D services and, if so, what should be prescribed * * *" 8 F.C.C.2d 178, 180 (1967).
 The relevant statutory sections provide as follows: Section 201(b), 47 U.S.C. § 201(b): "(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this Act may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications * * *."
 Section 202(a), 47 U.S.C. § 202(a): "(a) It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."
 Section 205(a), 47 U.S.C. § 205(a): "(a) Whenever, after full opportunity for hearing, upon a complaint or undue an order for investigation and hearing made by the Commission on its own initiative, the Commission shall be of opinion that any charge, classification, regulation, or practice of any carrier or carriers is or will be in violation of any of the provisions of this Act, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed, and what classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent that the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any charge other than the charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed."
 
 
 [4]
 Over the objections of the airline industry parties that the Telpak sharing provisions could not be considered in a vacuum and were inextricably related to other aspects of the Telpak rate level, rate relationship, and rate structure, under consideration in other proceedings (Docket No. 16258, as well as Docket No. 18128), the Commission repeatedly denied the airlines' motions to consolidate for hearing the instant case with those other cases. In fact, the Commission stated that the sharing practice was a distinct question from the other issues and that "it is necessary to first determine the lawfulness of an apparent discrimination before the overall rate levels and the compensatory nature of a given service can be evaluated." 12 F.C.C.2d 467, 468 (1968). See also 23 F.C.C.2d at 608
 
 
 [5]
 The Telpak "sharers" are billed separately by the Telephone Company and no physical facilities are shared. In fact, the customer uses precisely the same physical facilities whether his service is ordinary private-line, Telpak, or shared Telpak
 
 
 [6]
 Section 205(a) is quoted in full in note 3,supra.
 
 
 [7]
 The Commission did upon reconsideration modify its initial decision by relieving the carriers of some of the administrative burdens that were implicit in the Commission's original direction that the carriers themselves would have to set up and maintain sharing arrangements for their customers. On reconsideration the Commission held that the carriers could properly require their customers to perform this function for themselves
 
 
 [8]
 Petitioner Western Union does not concur in the first and third points. In fact, it agrees with the Commission that the existing Telpak sharing provisions are unlawfully disciminatory and in violation of § 202(a) of the Act. Western Union's only argument on appeal is that the Commission erred in prescribing unlimited sharing as the remedy for that discrimination
 
 
 [9]
 The testimony involved was that given by the airline parties and the National Association of Motor Bus Operators (NAMBO) as to whether they would shift to private microwave absent Telpak sharing
 
 
 [10]
 The Airlines and NAMBO make another contention as to the Commission's finding of unlawful discrimination. That contention concerns § 201(b) of the Act, quoted in note 3,supra. According to these parties, the Commission should have found that the existing limited Telpak sharing is a just and reasonable classification under § 201(b), and that the Commission erred in holding that Telpak sharing is not a classification of "communications" but of "customers," which, according to the Commission, is not permitted by § 201(b). We find this contention to be without merit.
 
 
 [11]
 Section 205 (a) is quoted in full in note 3,supra.
 
 
 [12]
 In its order on reconsideration the Commission appears to suggest that it was not required to make any findings with respect to rates because in this case it was dealing only with the practice of sharing. This suggestion disregards the actual impact of the Commission's order. Although in form it may be directed to a practice, its impact is to fix or prescribe lower rates for a large group of private-line customers who have not heretofore had the advantage of those rates. The courts have held that it is the actual impact of agency action and not its form that is decisive in determining the nature of the findings and evidence that are required to support the action. Baltimore & O. R.R. v. United States, 277 U.S. 291, 300, 48 S.Ct. 520, 72 L.Ed. 885 (1928); Houston Belt & Terminal Ry. v. United States, 153 F.Supp. 3, 7-8 (S.D.Tex. 1957), aff'd, 356 U.S. 23, 78 S.Ct. 560, 2 L.Ed.2d 578 (1958); Moss v. CAB, 139 U.S.App.D.C. 150, 430 F.2d 891 (1970)
 
 
 [13]
 The Commission attempted to retreat from this conclusion in its memorandum opinion and order on reconsideration:
 "At no point in our decision did we require the elimination of the Telpak rates. To the contrary, or decision was that all users should be able to share in the Telpak rates on an equal footing with those who can now share." 26 F.C.C.2d at 864.
 "However, we wish to make clear that our decision herein is not to be construed as implying that bulk rates cannot be justified * * *. We are saying however, that if and when such bulk rates are found proper, they cannot be limited to chosen persons or classes of persons but must be made available to all persons desiring to avail themselves of such bulk rates." 26 F.C.C.2d at 868.
 Since the concept of both Telpak and "bulk rates" is a special rate offering to high-volume users, it is difficult to understand the Commission's statement that Telpak will be preserved while made available to all private-line customers, and that bulk rates are permissible so long as everyone (i. e., non-bulk and bulk users alike) can have them.
 
 
 [14]
 See note 4,supra, and accompanying text.
 
 
 [15]
 Professor Davis has a full discussion of the pros and cons of requiring the separation of functions in rule-making proceedings such as that here, in Davis, Administrative Law § 13.00, 1970 Supp., at 442-457
 
 
 [16]
 See Ross, "Current ABA Proposals for Amendment of the Administrative Procedure Act," 23 Adm.L.Rev. 67 (1970); Administrative Conference of the United States, Committee on Rule Making, "Improvements in the Conduct of Federal Rate Proceedings," Recommendation No. 19, reprinted as S.Doc.No.24, 88th Cong., 1st Sess., pp. 69-114 (1963)
 
 
 [17]
 Section 1(7) of the APA, 5 U.S.C. § 551(7), provides that "`adjudication' means agency process for the formulation of an order"; and § 1(6) of the APA, 5 U.S.C. § 551(6), defines "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."
 
 
 [18]
 Section 1(5) of the APA, 5 U.S.C. § 551(5), defines "rule making" as the "agency process for formulating, amending, or repealing a rule"; and § 1(4) of the APA, 5 U.S.C. § 551(4), defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing."